Amerigo G. GIANNINI et al.

v.

STANDARD OIL COMPANY, an
Indiana Corporation.

Civ. A. No. 496.

United States District Court,
N. D. Indiana, Hammond Division.

March 3, 1955.

Timothy P. Galvin, of Galvin, Galvin & Leeney, Hammond, Ind., for plaintiffs.

Glenn D. Peters, of Peters & Highland, Hammond, Ind., Thomas E. Fiske, Chicago, Ill., for defendant.

SWYGERT, Chief Judge.

This opinion shall be deemed the Court's findings of fact and conclusions of law.

There are forty-five plaintiffs in this action, seeking compensation from the defendant, Standard Oil Company, for the overtime hours they worked at various times between April, 1942 and December, 1945. Their claims are based on the Fair Labor Standards Act of 1938, as amended 29 U.S.C.A. § 201 et seq.

After a motion by the defendant for summary judgment was denied, counsel for all parties agreed to select from the named plaintiffs those claims which were somewhat representative of all the plaintiffs and to try these cases first. The four plaintiffs so selected and whose cases have been tried are John Dann, Edward A. Westbay, William C. Berg, and Marion D. Reed. They will be referred to hereafter as the plaintiffs.

The defendant operates oil refineries at Whiting, Indiana, Wood River, Illinois, and other points, for the production of petroleum products. These products are shipped in interstate commerce. The largest of defendant's refineries, the Whiting refinery, maintains an Engineering Department which is responsible for the operation and maintenance of this refinery. Within the Engineering Department there is an Engineering Inspection Department handling the inspection work of the Engineering Department, and it was here that the plaintiffs were employed during the period for which they have made claim.

The work of the plaintiffs in this Department was that of inspecting defendant's plant facilities, and was directed toward the maintenance, safety and operational efficiency of these various facilities. The plaintiffs' maintenance inspection work involved testing and inspecting equipment in use. During certain portions of the period considered herein the plaintiffs also did inspection work in connection with new construction. Generally, the methods and the tools used were the same whether the inspection involved the maintenance of equipment in use or the inspection of new construction. The plaintiffs worked on towers, vessels, pumps, exchangers, line work, and other equipment of vari-

ous units of the defendant. Besides the work on this unit equipment the plaintiffs also worked on agitators, separators (tanks), vessels, such as salvage vessels, and pipes. The plaintiffs' inspection work was performed by means of visual examinations, calipers, hammers, x-ray examinations, wire brushes, knives, etc.

The equipment in operation was primarily inspected to determine whether there was corrosion, whereas the new equipment was checked to determine whether it was being built or fabricated in accordance with certain plans and specifications.

The work of one plaintiff, Dann, during the period under consideration, was largely that of testing certain areas for the existence of toxic gases. By means of a gas test instrument, a bottle of lead acetate and a piece of filter paper, Dann would check for petroleum vapors and hydrogen sulfide, record his findings on a piece of paper and hand this over to the proper party.

Except for Dann, some of the work performed by the plaintiffs was on new construction away from the Whiting refinery. Westbay did some inspection work on welds of new equipment at defendant's refinery at Wood River, Illinois. Reed, Berg, and Westbay spent a great deal of time doing inspection work on new equipment at various contractors' factories outside Indiana. This new equipment was destined for one of the defendant's refineries either at Wood River or Whiting.

An illustration of the manner in which one of the plaintiffs, Westbay, performed his maintenance inspection work affords a descriptive insight into this phase of all of the plaintiffs' work. One of the types of maintenance work performed by Westbay was called tank work. He would begin with a "tank" form given him by the defendant which listed all the parts of the tank, and which outlined every phase of the inspection that was to be made on a particular tank. For example, the form might start off with

the bottom of the tank, stating the minimum thickness of the bottom and then it would say "condition". Westbay would inspect the bottom looking for corrosion by entering the tank and visually inspecting the bottom. Then he would hammer test it by hitting the bottom with a hammer. He could sometimes determine from the sound or the ease with which the bottom was dented if the body was thin. Then he would have holes drilled in the bottom and insert a caliper within these holes to measure the thickness of the bottom plate, and this measurement he would record. Next, he would, if so indicated on the form, inspect the shell, the roof plates and so on, inspecting all the parts of the tank indicated on the form. The thickness of all these parts would be recorded on the form, and later copied onto another paper which would be given to his superior. On the bottom of the form there would be a space where recommendations might be made; if, for example, there were large holes in the roof of the tank Westbay could recommend that it be scrapped. The Engineering Design Department would look the form over and decide what should be done with the tank.

Although there were many variations of the maintenance inspection work performed by the plaintiffs, this example serves to illustrate the nature of these day-to-day activities of Westbay, Berg and Reed, and at least to some extent, of Dann. As to the inspection work connected with the new equipment, this was primarily a matter of examining the new equipment in the same general manner as the equipment in operation was examined, and determining whether it measured up to the specifications contained in blueprints, designs and plans given the plaintiffs by the defendant.

### I—Coverage

The plaintiffs' claim for overtime compensation under the Fair Labor Standards Act has been attacked at the threshold by the defendant's assertion that these plaintiffs are not entitled to the protection of the act.

Title 29 of the U.S.C.A. § 208(a) specifies two instances where employees are covered by the Fair Labor Standards Act: (1) where employees are engaged in commerce, or; (2) where employees are engaged in the production of goods for commerce. The defendant admits that the plaintiffs were engaged in the production of goods for commerce while performing their duties as inspectors in maintaining the operations of the Whiting refinery. It denies that they were so engaged, however, during the time when the plaintiffs were working on the inspection of new equipment in connection with certain construction projects undertaken by the defendant at its Whiting and Wood River refineries. Each of the plaintiffs worked to some extent in connection with one or more of these projects. The parties have stipulated that if it is deemed necessary, the defendant will segregate the time spent by the plaintiffs on these assignments.

The number and type of these construction projects have been stipulated by the parties. The following is a list of the specific units which are involved:

| Stipulated Unit No. | Completed |
| --- | --- |
| 1. Fluid Cracking Unit #600, Whiting | 10/3/46 |
| 2. Fluid Cracking Unit #500, Whiting | 3/25/45 |
| 3. Vapor Recovery Unit #100, Whiting | 9/6/46 |
| 4. Vapor Recovery Unit #200, Whiting | 3/18/48 |
| 5. Hydroformer & Toluene Extraction Plant, Whiting | 9/1/43 |
| 6. Alkylation & Butane Isomerization Plant, Whiting | 12/31/43 |
| 7. Isomate Unit, Whiting | 12/31/43 |
| 8. Butadiene Plant, Wood River | (never completed) |
| 9. Alkylation & Butane Isomerization Plant, Wood River | 4/18/44 |
| 10. Projects in connection with Atomic Bomb Work, Whiting #4 Process Lab | (date of completion not known) |
| 11. No. 2 Stanolind Station | 7/10/43 |
| 12. Pentane Fractionating Unit, Whiting | 2/22/44 |
| 13. Fluid Cracking Unit, Wood River | 1/ /44 |
| 14. Feed Preparation Unit, Whiting | 6/22/43 |
| 15. Cracked Naptha Fractionator, Whiting | 11/29/43 |
| 16. Propylene-Poly Plant, Wood River | (never completed) |
| 17. No. 2 Water Station, Whiting | 7/3/43 |
| 18. 3A R.A.N. Treating Plant, Whiting | 9/13/42 |

Much of the work done by Westbay, Berg and Reed in connection with these so-called "excepted units" was outside Indiana and at various contractors' plants and factories. Westbay and Berg were at the Foster-Wheeler Corporation and the M. W. Kellog Company factories in New Jersey. Berg was at other contractors' factories in Johnstown, Pennsylvania; Youngstown, Ohio; Chicago, Illinois; and at the Naval Yards, Washington, D. C. Reed was at the Tulsa Boiler and Machine Company in Oklahoma.

The machinery equipment and parts that Reed, Berg and Westbay inspected at these contractors' plants and factories were shipped interstate either to Wood River or Whiting. As to this part of their inspection work there can be no doubt that it was work in the production of goods for commerce. This is, however, not the basis for the decision of the coverage question.

Persons engaged in the construction of new interstate instrumentalities are not covered by the act, Durkin v. C. W. Vollmer & Co., D.C., 113 F.Supp. 235; but they are covered if they are engaged in the construction of new industrial facilities which constitute an enlargement or extension of existing interstate instrumentalities. Walling v. McCrady Construction Co., 3 Cir., 156 F.2d 932.

While it is true that the excepted units were in the process of being constructed during the time the plaintiffs worked upon them and that none of them were used for production during this period, nevertheless they were intended as, and in fact became, an integral part of, the defendant's existing operations. All of those that were completed eventually were connected with the existing refinery facilities. They were neither located at a new site, separate and apart from the Whiting and Wood River plants, nor were they designed to produce or to aid in the production of products that were not intimately connected with the existing refinery operations and products.

Accordingly, it is determined that the excepted units were either replacements or expansions of the defendant's existing facilities and that the work done by the plaintiffs in connection with these units was not "new construction" as contended by the defendant. It follows that the plaintiffs were engaged in the production of goods for commerce during all the time they worked on the excepted units, and are entitled to the protection of the act for the period for which they have made claim.

## II—Hours Worked

The Fair Labor Standards Act of 1938. as amended 29 U.S.C.A. § 207, subsection (a) provides: "No employer shall employ any of his employees who is engaged in commerce or in the production of goods for commerce for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed." The evidence is undisputed that each of the plaintiffs worked for the defendant in excess of forty hours per week during all of the time involved in this action. The defendant admitted this in its answer and before the trial it was stipulated by the parties that the total overtime worked by each plaintiff was: Berg, 1,838¼ hours, Dann, 477¾ hours, Reed, 1,727 hours, and Westbay, 1,916¼ hours.

The defendant contends that the plaintiffs were paid for this overtime in accordance with the requirements of the Fair Labor Standards Act as amended. Before reaching that question, however, two other defenses asserted by the defendant should be considered and determined.

The first of these defenses is based on the exemption provision of the Fair Labor Standards Act, 29 U.S.C.A. § 213. Subsection (a) (1) of this Section provides, inter alia, that "The provisions of sections 206 and 207 of this title shall

not apply with respect to \* \* \* any employee employed in a bona fide \* \* \* administrative [or] professional \* \* capacity \* \* \* (as such terms are defined and delimited by regulations of the Administrator)".

The second defense is based on Section 9 of the Portal-to-Portal Act of 1947, 29 U.S.C.A. § 258, which provides in part as follows: "\* \* \* no employer shall be subject to any liability \* \* \* for or on account of the failure of the employer to pay minimum wages or overtime compensation under the Fair Labor Standards Act of 1938, as amended, \* \* \* if he pleads and proves that the act or omission complained of was in good faith in conformity with and in reliance on any administrative regulation, order, ruling, approval, or interpretation, of any agency of the United States, or any administrative practice or enforcement policy of any such agency with respect to the class of employers to which he belonged."

### III—Exemption Defense

The greater portion of the evidence introduced at the trial pertains to the nature of the work performed by the plaintiffs during the dates in issue. This evidence in turn bears on the exemption defense. The defendant asserts that the plaintiffs were employed in a bona fide administrative or professional capacity during the periods in question. Both parties recognize the applicability of the definitions of these terms as promulgated by the Wage and Hour Division, Department of Labor, and which were in effect from October 24, 1940, until January 1, 1949.

According to these definitions an administrative employee must, *inter alia,* be one

"(1) Who regularly and directly assists an employee employed in a bona fide executive or administrative capacity (as such terms are defined in these regulations), where such assistance is nonmanual in nature and requires the exercise of dis-

cretion and independent judgment; or

"(2) Who performs under only general supervision, responsible nonmanual office or field work, directly related to management policies or general business operations, along specialized or technical lines requiring special training, experience, or knowledge, and which requires the exercise of discretion and independent judgment; or

"(3) Whose work involves the execution under general supervision of special nonmanual assignments and tasks directly related to management policies or general business operations involving the exercise of discretion and independent judgment; \* \* \*." Appendix—Rules and Regulations, 29 U.S.C.A. § 541.2.

A professional employee must, *inter alia,* be one who is

(a) "Engaged in work:

"(1) Predominantly intellectual and varied in character as opposed to routine mental, manual, mechanical, or physical work, and

"(2) Requiring the consistent exercise of discretion and judgment in its performance, and

"(3) Of such a character that the output produced or the result accomplished cannot be standardized in relation to a given period of time, and \* \* \*

"(5) (i) Requiring knowledge of an advanced type in a field of science or learning customarily acquired by a prolonged course of specialized intellectual instruction and study, as distinguished from a general academic education and from an apprenticeship, and from training in the performance of routine mental, manual, or physical processes; or

"(ii) Predominantly original and creative in character in a recognized field of artistic endeavor as opposed to work which can be produced by a person endowed with general manual or intellectual ability and training,

and the result of which depends primarily on the invention, imagination or talent of the employee, * * *." Appendix—Rules and Regulations, 29 U.S.C.A. § 541.3.

■ To come within the definition of an administrative employee under these regulations, it is necessary that the nature of the work the employee is engaged in requires the exercise of discretion and independent judgment.

The plaintiffs' inspection of the new equipment and the equipment in operation was guided by form sheets, blueprints, tables, diagrams and other predetermined standards. They were generally told where to inspect and what to look for. They did not have the authority to determine what the effect of their inspection should be though they were often permitted to make recommendations. The reports of their inspections were not critical analyses of the equipment they inspected, but ordinarily were merely figures indicating dimensions of parts of the inspected equipment or other brief facts about the condition of the equipment.

While the plaintiffs were learning their inspection work, they were closely supervised and given rather explicit instruction where equipment was located or an area found, and what parts of particular equipment or areas were to be inspected or tested. When they had become more familiar with their work and the general area of the refinery they required less instruction and were more capable of performing their inspection work on their own. They would discuss their findings on occasions with their supervisors or other interested workers, but by and large the information they obtained they would pass up through the department on a written form.

Dann's work in connection with the inspection of certain areas for the existence of toxic gases, although different in nature from the inspection work of the other plaintiffs, commanded little more exercise of discretion and independent judgment. Dann would be told what areas or units to inspect and would then proceed to the place directed where often he would be directed by someone else as to the precise area to be tested. In testing for petroleum vapors he would use the gas testing instrument which registered the amount or percentage of petroleum vapors present. In testing for hydrogen sulfide Dann would determine its presence by the coloration of the filter paper. He would then record his findings on a ticket and give this ticket to someone else. Dann did not have discretion to determine whether work should be performed in a certain area because of the presence or absence of gas.

■ The general nature of this work of the plaintiffs did not involve the exercise of discretion or independent judgment within the meaning of the regulations. The exemption provisions of the act are to be strictly construed. Pugh v. Lindsay, 4 Cir., 1953, 206 F.2d 43, 46. The terms "discretion" and "independent judgment" connote liberty of action and freedom in the exercise of judgment. Certainly every employee, no matter how routine his job, has some liberty of action and freedom in the exercise of judgment. But where the liberty of action given the employee involves minor physical variations and a minimum amount of authority to make unbinding recommendations, he is not exercising that degree of discretion and independent judgment required by the regulations. An excerpt from the district court opinion quoted by the Court of Appeals for the Seventh Circuit in McComb v. Robert W. Hunt Co., 7 Cir., 1949, 172 F.2d 751, 754, in an analogous situation is relevant. " 'The inspectors' work is so prescribed and so laid out that while they must exercise a high degree of skill in making certain determinations, they are not required, in fact, not permitted to exercise discretion and independent judgment in the normal performance of their duties.' "

■ Besides the necessity of the use of discretion and independent judgment, an administrative employee under the

regulations must fit into one of the three categories enumerated above. It cannot be found from the evidence that the plaintiffs regularly and directly assisted an employee employed in a bona fide executive or administrative capacity. Often the plaintiffs would go out on a job by themselves. Sometimes a supervisor would accompany them, but the evidence does not show that these supervisors were employed in a bona fide executive or administrative capacity. The only persons who without definitive proof might be considered administrative or executive employees, would be the design engineers, W. R. Burrows, F. A. Upson, and Benjamin Franklin, or Joseph W. Yant, assistant to the head of the inspection department during this period, and there is no evidence that the plaintiffs regularly and directly assisted any of them. The language "regularly and directly assist" must mean more than merely that they carried out the policies or worked under such persons, otherwise every employee would come within this category.

The other two categories of administrative employees require that the employees' work be directly related to management policies or general business operations.

It is clear that the inspection work performed by the plaintiffs was not directly related to management policies. Although the work was probably consistent with and carried out management policy, the inspection work itself did not involve any management policy considerations as such. Furthermore the inspection work was not related to general business operation, but involved specific tasks or operations on specific units throughout the refineries and other locations.

■ It should be noted that all three categories of the definition of administrative employees require that the work be nonmanual in nature. The plaintiffs' field work required that they go out to the location of the particular equipment they were to inspect, observe the equipment by walking around and getting inside it, inspect it with the aid of various types of tools such as calipers, hammers and knives, make written reports of their inspection, and handle and file blueprints, form sheets and inspection files. It would appear from this that the nature of their work was in part manual. Considering all of these factors in light of the regulations and the judicial interpretation of this exemption provision it seems reasonable to conclude that none of the plaintiffs were exempt as administrative employees.

■ The defendant's alternative contention, that the plaintiffs were exempt as professional employees, does not stand up under the regulations. Under this provision of the regulations it is necessary that the work require the "consistent" exercise of discretion and judgment. The conclusion that the plaintiffs were not administrative employees under a similar and even less stringent requirement forecloses a determination that they were professional employees. There are other reasons however why they did not fit within this category. Although the meaning of predominantly intellectual under section 541.3(a) (1) of the regulations (see the definition of professional employees) is difficult to apply to a factual situation, it would appear that the major portion of the inspection work performed by these plaintiffs involved more of a routine mechanical and physical operation than an application of the thinking process. Nor could the plaintiffs bring themselves under the requirements of subsection (a) (5) of this provision of the regulation. Part ii of this particular subsection is clearly inapplicable to the work done by the plaintiffs. As to part i of this subsection, the record shows the following facts about the instruction and study of the plaintiffs. Dann graduated from high school and later took a course in acetylene welding. There is no evidence, however, that he ever took any specialized course in gas testing or maintenance inspection work. Westbay also graduated from high school, and, later took some mechanical drawing lessons at night

school. There is no evidence that Westbay's inspection work required knowledge of an advanced type which he acquired by prolonged courses of specialized intellectual instruction and study. There is also absent from the evidence any showing as to the acquisition of any such study or instruction by either Reed or Berg. It is evident that the plaintiffs did not fall within the exemption classification of professional employees during the period involved.

As a consequence of these findings it is concluded that all four plaintiffs were not exempt employees within the meaning of 29 U.S.C.A. § 213.

### "Portal-to-Portal" Act Defense

We come now to a third major issue in dispute; that is, was the defendant's failure to pay the compensation alleged to be owing based on its good faith reliance on a ruling, interpretation or approval of an agency of the United States? Such good faith reliance under Section 9 of the Portal-to-Portal Act, 29 U.S.C.A. § 258, would absolve the defendant completely from paying any overtime compensation found to be due under 29 U.S.C.A. § 207(a). This defense was raised earlier in the case by the defendant in a motion for summary judgment filed August 16, 1950, against Patrick T. Murphy, one of the forty-five plaintiffs in this action. The court denied the defendant's motion in a memorandum opinion of April 21, 1952, wherein certain facts taken from supporting affidavits were recited. During the trial involving these four plaintiffs the defendant introduced evidence seeking to present a record whereby the court would have before it a factual basis to reconsider the defense under the Portal-to-Portal Act. In essence this defense is predicated on certain actions of the Wage and Hour Division between the years 1940 and 1945.

The following résumé of the evidence is intended to demonstrate those activities of the Division during the period involved which are pertinent to this defense.

Sometime in 1940 a complaint was made to the Division's Kansas City Office of a violation of the Fair Labor Standards Act at defendant's sales office in Saint Joseph, Missouri. An investigation was then undertaken by the Kansas City Office commencing with the defendant's sales office in Saint Joseph, and later in 1940 branching out into all of the defendant's establishments.

The defendant was concerned over the question of which of the Division's regional offices was to conduct the investigation; the Kansas City or the Chicago Regional Office. In pursuit of an answer one of its attorneys made inquiry of Walter W. King, the then acting regional director of the Division at Kansas City. The evidence goes no further than to show that the meeting concerned this inquiry. There is no evidence to indicate that any request was made or advice sought as to the defendant's compliance under the act either at this particular meeting or on any subsequent occasion.

As events turned out, the investigation in 1940 of the defendant was conducted through the Kansas City Office and was accomplished mainly by Phil R. Clarkson, an inspector. Although King accompanied Clarkson during some of these investigations, he did not participate in the inspection at the Whiting refinery.

At the culmination of this phase of the investigation, the Division at the instigation of King issued a press release. This release dated October 28, 1940, recited that the defendant had paid sums of money to certain of its employees which represented the difference between the wages received by these employees and the amount to which they were entitled under the act and that the defendant was in compliance with the act. The defendant also introduced a letter written by King on November 30, 1940, to C. Henry Austin, the defendant's general counsel, to the effect that inasmuch as the reports of the investigation indicated that the Company had made payment of back wages and

was in compliance with the act, King was closing his files on the investigation that had commenced with the complaint at Saint Joseph, Missouri.

Investigation by the Kansas City Office of the activities of the defendant in relation to the act, however, did not terminate.

The defendant submitted in evidence a memorandum of its own wage and hour committee dated October 31, 1940, which contained recommendations of defendant's committee as to the classification of certain employees. Plaintiffs Berg and Westbay appear on the list of those employees classified as professionals. At the end of the memorandum there is a notation signed by Clarkson stating that "The classifications made on this * * memo * * * are in compliance with Regulation 541 * * * based on facts presented in regard to the duties of said employees." The date of the notation is December 31, 1940, a month after the press release was issued, thus indicating that the investigation of defendant was continued in spite of the statement in the press release.

Further evidence showed a later investigation of the defendant by the Kansas City Regional Office occurring between September, 1943 and April, 1944. According to the testimony of defendant's witnesses, King and a Mr. Sohns (who was connected with the Kansas City Office) were at the Whiting refinery during this period interviewing a large number of employees. After this investigation King drafted a report and submitted it to the regional attorney for his approval of the exemption classifications contained in the report. After the regional attorney had examined the report, a letter dated April 4, 1944, was sent to the defendant by King. The only plaintiff classified in this letter was Berg, and although his status as an exempt employee remained unchanged from the determination made in the earlier investigation, his classification as a professional employee was changed to that of administrative employee.

The only evidence which might indicate that there was any review of these findings by the Administrator of the Division appears in the fact that the report of this latter investigation was sent to Washington in April, 1944, and remained there until May 23, 1945, at which time it was returned to the Kansas City Office. There is no evidence, however, of any specific review or approval by the Administrator himself of the report or findings of the Kansas City Office.

In an attempt to demonstrate that the activities of the Kansas City Office were final administrative actions, or in the language of the Portal-to-Portal Act, 29 U.S.C.A. § 151 et seq., rulings, interpretations or approvals by an agency of the United States, the defendant elicited testimony from A. Metcalfe Walling (Administrator of the Fair Labor Standards Act from 1942 to 1947) as to the finality of the action of the regional offices of the Wage and Hour Division. Mr. Walling testified that prior to and during this period there was a policy of the Division to decentralize more and more authority from the Administrator's office to the offices of the regional directors and regional attorneys. He also stated that it was the practice of the Division to have the regional directors decide, without looking to higher authorities, whether or not certain establishments were complying with the act, and that this decision was ordinarily the decision of the Division.

The plaintiff, on the other hand, sought to contradict the defendant's assertion that the regional offices' determinations in cases like this were final, by introducing five letters sent by Thacher Winslow (the then deputy administrator of the Wage and Hour Division) to the Employees Association of the Standard Oil Company. The letters indicate that before the Kansas City Office submitted the findings of its investigation to the defendant on April 4, 1944, the Employees Association inquired of Winslow regarding the status under the act of the field and inspection engineers of

the defendant. Winslow deferred answering this inquiry until the regional office had made its findings from the investigation of 1943–1944. After the findings were made by the regional office, Winslow's office obtained the file on the investigation and referred it to the Exemption branch of the Wage and Hour Division. On June 21, 1945, Winslow wrote the Employees Association that the Exemption branch had found that most of the field and inspection engineers of the defendant were not exempt under the act. A relevant question on this phase of the Division's activities would seem to be whether the Exemption branch could overrule the regional director. Walling testified in response to such an inquiry that it could not.

The majority of these facts as summarized from the trial record on the Portal-to-Portal Act defense also appear in the affidavits in support of the defendant's motion for summary judgment. Additional evidence presented at the trial, however, includes: the testimony of A. Metcalfe Walling, who, as Administrator of the Wage and Hour Division, indicated that his office had delegated the authority to make certain final rulings or approvals, and that the Kansas City Regional Office was given authority in this regard over the activities of the defendant; letters from King to the defendant indicating the Kansas City Office's determination of the exemption classification of certain of defendant's employees as a result of inspections of these employees in 1940 and again in 1943–44; and, letters from Thacher Winslow to the Employees Association at Standard Oil regarding the activities of Winslow and the Exemption branch of the Wage and Hour Division, in connection with the determinations made by the Kansas City Office in 1944.

In ruling on the motion for summary judgment this Court examined two questions: (1) whether such governmental action amounted to a ruling, approval or interpretation of an agency of the United States, and; (2) whether the ruling, approval or interpretation in-volved was one contemplated by the statute. The Court is of the opinion that these are still the two important legal issues related to the Portal-to-Portal Act defense in this case.

The evidence indicates that the Kansas City Office, acting by its regional director, King, had been delegated authority by the Administrator of the Division to make a final ruling or approval of the classifications made by the defendant. There is also evidence that King did exercise such authority as to certain of the plaintiffs. Such a ruling or approval made in accordance with established agency procedure was final agency action; it was a ruling or approval of the agency itself. This finding is not affected by the fact that the Administrator had power to review and reverse such action of the regional offices, as Walling testified that only in a few instances were there actually any reviews by the Administrator, and even then the regional offices' determinations were seldom changed.

Although such action was agency action so far as the Division itself was concerned, there is some doubt as to whether the authority to make this type of ruling or approval could be delegated by the Administrator to the regional director. See Cudahy Packing Co. of Louisiana v. Holland, 1942, 315 U.S. 357, 62 S.Ct. 651, 86 L.Ed. 895. If such authority could not be lawfully delegated there is a further question as to the legal effect of the ruling or interpretation; that is, would it make any difference under the Portal-to-Portal Act that such power could not lawfully be delegated if in fact it was delegated and there was some reliance on the ruling or approval.

In determining the applicability of this defense under this set of facts, it is not necessary, however, to answer these questions. The decision on this defense resolves itself on the fact that the ruling, interpretation or approval involved here was not one contemplated by the statute. As stated by this Court in its ruling on the motion for summary judgment, "We are dealing with an administrative evalu-

ation of certain facts with reference to a regulation previously promulgated by the Wage and Hour Division for all employer-employee relationships coming within the purview of the Fair Labor Standards Act. What is involved is an interpretation of a particular set of facts to a regulation rather than an interpretation of the law with reference to [a set of facts of general applicability]. It is only the latter kind of ruling, approval or interpretation to which Section 9 of the Portal-to-Portal Act applies. I believe this view accords with that expressed in Burke v. Mesta Machine Co., D.C., 79 F.Supp. 588 [610]: 'These words (an administrative "regulation, order, ruling, approval, or interpretation"), as used with reference to the Wage and Hour Division, can only refer to the well-established practice of the Wage and Hour Administrator of issuing formal statements as to enforcement policy with respect to particular industries. The qualifications written into Section 9 obviously could have no reference to the case of a Wage and Hour inspector speaking of a particular inspection of a particular employer. What is meant—Are the formal Interpretative Bulletins, Rulings and Opinion Letters issued by the Administrator or his authorized deputies, or similar rulings, etc., issued by any other governmental agency.' "

■■■ The type of "approval" which the statute refers to is not found in the set of facts before this Court. The approval of an employer classification must originate from an inquiry or request by the employer. Bauler v. Pressed Steel Car Co., D.C.N.D.Ill.1948, 81 F.Supp. 172, 176. An employer cannot bring himself under Section 9 by claiming good faith reliance on an approval of a prior employer classification where the approval is made subsequent to an investigation by the agency of employee classifications and the investigation is invoked as the instance of the agency and not the employer. Such an agency ruling stems from its findings as to the status of specific employees, rather than an in-terpretation of the law to a state of facts of general applicability. As stated above, the latter is the type of ruling contemplated by the statute. It is this reasoning which brings me to the determination that Section 9 of the Portal-to-Portal Act is not a bar to the claims of the plaintiffs.

### Payment for Overtime

The determination that the plaintiffs were not exempt employees and that the defendant failed to prove that it was entitled to the relief of Section 9 of the Portal-to-Portal Act presents for final inquiry the question of what payments, if any, are due the plaintiffs under the Fair Labor Standards Act. There are three issues in this phase of the case, each of which shall be treated separately.

The defendant claims that the plaintiffs have been fully compensated for the work performed during the overtime hours. To support its position the defendant introduced into evidence the plaintiffs' "service records," kept by the defendant, in order to demonstrate that the plaintiffs received an increase in compensation for the overtime hours they worked in accordance with the "Overtime on Overtime" provisions of the Fair Labor Standards Act, 29 U.S.C.A. § 207 (d) et seq. Section 207(d) (7) and (g) when read together, have the effect of banning a claim for further compensation for overtime hours worked if the employer has made payment according to the specifications of § 207(d) (7). The latter section provides that the regular rate at which an employee is employed shall not be deemed to include "extra compensation provided by a premium rate paid to the employee, in pursuance of an applicable employment contract or collective-bargaining agreement, for work outside of the hours established in good faith by the contract or agreement as the basic, normal, or regular workday (not exceeding eight hours) or workweek (not exceeding forty hours), where such premium rate is not less than one and one-half times the rate established in good faith by the contract or agreement

for like work performed during such workday or workweek." Section 207(g) reads: "Extra compensation paid as described in paragraphs (5)–(7) of subsection (d) shall be creditable toward overtime compensation payable pursuant to this section." Section 216(b) of the act gives retroactive effect to these provisions so that they apply to the present controversy.

The "service records" which the defendant contends demonstrates that it made payment as called for by § 207(d) (7) lists in one column the date of different periods worked by the plaintiffs. These periods are separated because of a difference from one period to the next in the amount of the salary and hours worked. In another column opposite the column listing the dates of these different work periods is a list of the "rates". Opposite these two columns is a further column indicating either 40 hour weeks or 52 hour weeks for each of the dates listed in the adjoining column.

The defendant concedes that from April 1, 1942, to May 2, 1943, it did not pay plaintiffs an extra compensation in accordance with § 207(d) (7). It asserts, however, that from May 2, 1943, until November 19, 1945, payments were made by it to the plaintiffs which entitle it to the consideration given by the "Overtime on Overtime" provisions. To support its contention in this regard counsel referred during the argument to a specific pay period found in the "service record" of William C. Berg; namely from April 1, 1943, to May 2, 1943. This "service record" shows that opposite the date, April 1, 1943, a rate of $240 is listed and that another column opposite this date lists a 52 hour week. The defendant has referred to this specific $240 per month rate for a 40 hour week as a "basic rate" for a 40 hour week. The actual meaning of what was intended by the listing of the 40 hour week at a rate of $240 per month is not clear, but it does appear from other evidence that the 40 hours were neither the hours scheduled to be worked nor those actually worked, and that the $240 per

month rate was not the rate actually paid. In any event, the defendant has urged this court to conclude from these listed figures and dates that the increase in hours from 40 to 52 was an increase of 12 hours over a workweek of 40 hours, or a 30% increase; that the difference in rates of $240 and $348 or a difference of $108, was an increase in rates of 45%; and, that these figures show that the increase in rates was one and a half times the increase in hours. The defendant's contention is that the increase so calculated can be computed similarly for all the plaintiffs from the period May 2, 1943, to November 19, 1945, and that these payments constituted compliance with the applicable subsections of the "Overtime on Overtime" provisions.

I cannot agree with the contention of the defendant. In the first place the defendant has not shown that what it refers to as the "basic rate" was a rate established by contract or agreement as called for by § 207(d) (7). The mere listing of a $240 rate for a 40 hour week on a service record of an employee is inadequate proof of what the contract rate was. There is a more basic reason, however, why the "Overtime on Overtime" defense does not apply. Section 207(d) (7) calls for a premium payment at a rate not less than one and one-half times the contract rate. In order for an employer to bring himself within the provisions of this subsection it is necessary that the overtime premium be provided by a premium rate per hour based on the hours actually worked. Lump sum premiums which are paid without regard to the number of hours worked are not overtime premiums under section 207(d) (7). Interpretative Bulletins, C.C.H. Labor Law Reporter No. 24,104.14. "If the rule were otherwise, an employer desiring to pay an employee a fixed salary regardless of the numbers of hours worked in excess of 40 in the workweek could merely label as overtime pay a fixed portion of such salary sufficient to take care of compensation for the maximum number of hours that would be worked. The Congressional purpose to effectuate

a maximum hours standard by placing a penalty upon the performance of excessive overtime work would thus be defeated." *Ibid.* The salary paid the plaintiffs on a per month basis from May 2, 1943, to November 19, 1945, was paid them for the hours they were scheduled to work irrespective of whether they worked that exact number of hours. This fact was brought out by Glenn Henry, who was defendant's payroll office supervisor and assistant supervisor during the periods involved in this controversy. Thus, even if there had been an increase over the contract rate as contended by the defendant, such an increase would not have met the specifications of § 207(d) (7), and thus the "Overtime on Overtime" provisions cannot apply here.

Another issue in dispute as to the amount owed the plaintiffs is whether they are entitled to an allowance by the Court of one and a half or merely one half of the regular rate of pay. The plaintiffs are entitled to one and a half times the regular rate of pay for the hours they worked in excess of 40 in each week, but the act does not say that if they are not paid this amount by their employer they can recover one and a half times the regular rate of pay in this type of action. The plaintiffs assert the applicability of § 207, subsections (d) (7) and (g) and contend that because the provisions of subsection (d) (7) have not been met by the defendant no credit can be given it against the one and a half times the regular rate of pay owed the plaintiffs. It bases this argument on § 207(g). Section 207(g), however, is that part of the "Overtime on Overtime" provisions which enables an employer to credit extra compensation paid according to § 207(d) (5), (6) or (7), against the overtime compensation payable pursuant to the section. The overtime compensation payable under § 207(a) is, of course, one and a half times the regular rate of pay. Unless the extra compensation is paid according to § 207(d) (5), (6) or (7), § 207(g) can have no relation to § 207(a).

In computing the amount due under § 207(a) for salaried employees who have been paid straight time for all hours worked, only additional half time is due. Under the Interpretative Bulletins, C.C.H. Labor Law Reporter No. 24,104.03(b) (5), where an employee is paid by the week with the understanding that the salary is to cover all hours worked, his regular rate of pay will be the average hourly rate each week, determined by dividing the number of hours worked in the week into the amount he earns for the week. "Since the employee has already received straight time compensation on a salary basis for all hours worked, only additional half time is due."

The final issue to be discussed has to do with the question of the regular rate of pay for each of the employees during the period involved. The parties have entered into a stipulation denominated Stipulation No. 1-A filed July 29, 1953, the relevant portion of which reads, "It is stipulated * * * that where a column of figures entitled "Rate Per Hour As Arrived At By Calculation and Division, * * * appears in Stipulation No. 1, * * * the figures so appearing may be considered * * * as determining the *'regular rates of pay'* (as used in the Fair Labor Standards Act of 1938, and applicable amendments thereto) for such plaintiffs during the various months comprising the periods of time indicated." Reference to Exhibit A of Stipulation No. 1 readily shows the figures so indicated.

Exhibit A of Stipulation No. 1 lists for each employee separately the dates worked during the period for which claim is made. This entire period is divided so that there are several different periods listed by dates for each employee. Opposite each of these shorter periods is listed a certain number of hours, and at the extreme right-hand side of the page a figure for each of the periods is found and these figures are entitled the "Rate Per Hour As Arrived At By Calculation and Division."

The figures to which the stipulation refers as determining the regular rates

of pay were arrived at by dividing the number of hours *scheduled* to be worked in the particular period indicated opposite these figures into the total salary paid during that period for each employee. Both parties acknowledge that while this was not the proper method for determining regular rates of pay under the cases and the Administrator's interpretation of the act, yet they entered into the stipulation for the purpose of convenience, and to avoid the difficulty of making computation on a week-to-week basis of hours *actually* worked, as would otherwise have been necessary. The final arguments suggest that in the event it is determined that the "Overtime on Overtime" provisions are inapplicable, Stipulations 1–A and 1, relating to the regular rates of pay, should govern. Since the "Overtime on Overtime" provisions are inapplicable under the facts in this case, and in light of the reasons stated by counsel for the stipulations, it is concluded that the stipulations should be applied in arriving at the amounts due the plaintiffs.

■ Although the stipulations may incorporate an interpretation of the law which would not be binding on the court, I am reluctant to interfere with the understanding of the parties as to the method of computing the regular rates of pay, absent any objection by either party to be bound thereby.

### Liquidated Damages

Another matter confronts this court due to the request for liquidated damages in the amended complaint. Although this point was not argued by the parties, the statutory provisions related to these claims require that it be considered and determined. 29 U.S.C.A. § 216(b) provides, *inter alia*, that "Any employer who violates the provisions of section 206 or section 207 of this title shall be liable to the employee or employees affected in the amount of their unpaid minimum wages, or their unpaid overtime compensation, as the case may be, and in an additional equal amount as liquidated damages." Section 11 of the Portal-to-Portal Act leaves it to the discretion of the court to allow such liquidated damages, "if the employer shows to the satisfaction of the court that the act or omission giving rise to such action was in good faith and that he had reasonable grounds for believing that his act or omission was not a violation of the Fair Labor Standards Act of 1938, as amended". 29 U.S.C.A. § 260. In the court's memorandum decision on the motion for summary judgment it was stated that "the defendant acted in good faith in conformity with and in reliance on the action taken by the officials of the Wage and Hour Division." The subsequent proceedings have not changed this determination.

■ The question of what constitutes reasonable grounds for believing that the omission to pay the compensation claimed under the Fair Labor Standards Act was in issue in Bauler v. Pressed Car Co., D.C.N.D.Ill.1948, 81 F. Supp. 172, wherein the court held that reliance on an inspector's acquiescence in the classification by an employer of certain employees as exempt was a good defense against a claim for liquidated damages under Section 11 of the Portal-to-Portal Act, even though the inspectors were mistaken in their conclusions. The same situation appears in the present case. Although the classification by the defendant and the determinations made by the Kansas City Regional Office as to the status of the plaintiffs were erroneous, there were reasonable grounds for the defendant to believe that the plaintiffs were exempt employees under the act based on the facts recited previously under the discussion of the defense based on Section 9 of the Portal-to-Portal Act and the exemption defense. Consequently the claim for liquidated damages under 29 U.S.C.A. § 216(b) is denied.

At the beginning of the trial it was stipulated that the question of the determination of the allowance of attorneys' fees as a part of any judgment awarded to any of the four plaintiffs would be reserved until such time as there might be a determination made by the court

of liability under the act. In accordance with this stipulation the question of attorneys' fees is left open with full right to both parties to present evidence on this subject.

After a hearing and determination of the question of attorneys' fees, the parties will be requested to submit a form of decree on the sums due the plaintiffs consistent with the stipulations referred to and the findings of fact and conclusions of law contained herein.