Virginia MURPHY, Veronika Monostori, and Catherine Pelt, Plaintiffs,

v.

MILLER BREWING COMPANY, a Wisconsin corporation, Defendant,

v.

LOCAL UNION NO. 9 OF the INTERNATIONAL UNION OF the UNITED BREWERY, FLOUR, CEREAL, SOFT DRINK AND DISTILLERY WORKERS OF AMERICA, and International Union of United Brewery, Flour, Cereal, Soft Drink and Distillery Workers of America, AFL–CIO, Third-Party Defendants.

George P. SHULTZ, Secretary of Labor, United States Department of Labor [Successor to W. Willard Wirtz, Resigned], Plaintiff,

v.

MILLER BREWING COMPANY, a corporation,

v.

LOCAL UNION NO. 9 OF the INTERNATIONAL UNION OF the UNITED BREWERY, FLOUR, CEREAL, SOFT DRINK AND DISTILLERY WORKERS OF AMERICA, and International Union of United Brewery, Flour, Cereal, Soft Drink and Distillery Workers of America, AFL–CIO, Third-Party Defendants.

Nos. 65–C–272, 67–C–101.

United States District Court
E. D. Wisconsin.

Dec. 22, 1969.

Irvin B. Charne, Milwaukee, Wis., for plaintiffs in Case No. 65–C–272.

Herman Grant, Regional Atty., Ruth Provus, John C. Nangle, Attys., Office of Solicitor, U. S. Department of Labor, Chicago, Ill., for plaintiff in Case No. 67–C–101.

T. L. Tolan, Jr., and Samuel J. Recht, Milwaukee, Wis., for defendant, Miller Brewing Co.

Lawrence D. Gillick and Howard A. Davis, Milwaukee, Wis., for third-party defendant, Local Union No. 9.

Leonard S. Zubrensky and George F. Graf, Milwaukee, Wis., and James C. Paradise, Cincinnati, Ohio, for third-party defendant, International Union.

REYNOLDS, District Judge:

The plaintiffs seek injunctive relief and back pay because of alleged sex discrimination in employment practices. The action is brought under the provisions of the Fair Labor Standards Act, 29 U.S.C. § 201 et seq. ("§ 201") and in particular the Equal Pay Act, 29 U.S.C. § 206(d).[1]

The women plaintiffs were employed as laboratory technicians at the Miller Brewing Company ("Miller"). (Hereafter in this opinion, women and men laboratory technicians are referred to as "women and men.") Miller is a Wisconsin corporation with an office and plant in Milwaukee, Wisconsin. The third party defendants are the Local and International Brewery Workers Union that have the collective bargaining contract with Miller.

Plaintiffs contend that defendant Miller discriminated against the women on the basis of their sex and paid them less than they paid male employees who

---

1. 29 U.S.C. § 206(d):

"(d) (1) No employer having employees subject to any provisions of this section shall discriminate, within any establishment in which such employees are employed, between employees on the basis of sex by paying wages to employees in such establishment at a rate less than the rate at which he pays wages to employees of the opposite sex in such establishment for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions, except where such payment is made pursuant to (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex: *Provided*, That an employer who is paying a wage rate differential in violation of this subsection shall not, in order to comply with the provisions of this subsection, reduce the wage rate of any employee.

"(2) No labor organization, or its agents, representing employees of an employer having employees subject to any provisions of this section shall cause or attempt to cause such an employer to discriminate against an employee in violation of paragraph (1) of this subsection.

"(3) For purposes of administration and enforcement, any amounts owing to any employee which have been withheld in violation of this subsection shall be deemed to be unpaid minimum wages or unpaid overtime compensation under this chapter.

"(4) As used in this subsection, the term 'labor organization' means any organization of any kind, or any agency or employee representation committee or plan, in which employees participate and which exists for the purpose, in whole or in part, of dealing with employers concerning grievances, labor disputes, wages, rates of pay, hours of employment, or conditions of work."

were performing equal work on jobs under similar conditions requiring equal skill, effort, and responsibility. The women plaintiffs seek an award of an amount equal to the difference between the wages paid them and the wages paid the men plus liquidated damages and attorney's fees pursuant to 29 U.S.C. § 216(b).[2] The Secretary of Labor seeks injunctive relief against continued violation of the Equal Pay Act by Miller.

Miller denies that the lower wage rate paid the women was based on their sex. Miller contends that its job classifications and wage rates were and are now based on factors other than sex and the jobs in dispute were not equal jobs within the meaning of the Act. But Miller asserts that if there has been sex discrimination, it was caused by the Union and the Local which represented women in negotiating the collective bargaining agreements. Therefore, Miller asks for judgment against the Union for any amount for which Miller is liable.

An extensive trial to the court was held. The Court toured the Miller plant and viewed the operation of the laboratories involved in this action. Post-trial briefs have been submitted by all parties, and the Court is now prepared to make its decision, including the findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure.

Miller is engaged in the production and sale of beer which is sold in interstate commerce within the meaning of the Act. Section 206(d) [equal pay] has been applicable to Miller's employees since June 11, 1964.

Miller's Milwaukee plant covers about 55 acres and consists of a complex of some 50 buildings, many of which are physically connected.

There are two laboratory facilities which are principally involved in this case—one is the Analytical Lab and the other is the Packaging Lab.

The Analytical Lab occupies a large L-shaped portion of the second floor of the "Research Building." Its lab is equipped with a variety of testing equipment and supplies. The technicians perform tests to analyze and measure the chemical and physical properties and characteristics of (1) the raw materials used in the manufacture of the beer, (2) the beer in the process of manufacture, (3) the packaged beer, and (4) the beer of Miller's competitors. These tests are simple, routine, and standardized; they may accurately be described as "cookbook type" tests. No prior experience is necessary to perform these tests, and the only training required to learn how to perform them is demonstration of the standardized procedures. There are no differences of any signifi-

2. 29 U.S.C. § 216(b):

"(b) Any employer who violates the provisions of section 206 or section 207 of this title shall be liable to the employee or employees affected in the amount of their unpaid minimum wages, or their unpaid overtime compensation, as the case may be, and in an additional equal amount as liquidated damages. Action to recover such liability may be maintained in any court of competent jurisdiction by any one or more employees for and in behalf of himself or themselves and other employees similarly situated. No employee shall be a party plaintiff to any such action unless he gives his consent in writing to become such a party and such consent is filed in the court in which such action is brought. The court in such action shall, in addition to any judgment awarded to the plaintiff or plaintiffs, allow a reasonable attorney's fee to be paid by the defendant, and costs of the action. The right provided by this subsection to bring an action by or on behalf of any employee, and the right of any employee to become a party plaintiff to any such action, shall terminate upon the filing of a complaint by the Secretary of Labor in an action under section 217 of this title in which restraint is sought of any further delay in the payment of unpaid minimum wages, or the amount of unpaid overtime compensation, as the case may be, owing to such employee under section 206 or section 207 of this title by an employer liable therefor under the provisions of this subsection."

cance in terms of the skill, effort, and responsibility required to perform the various tests done in the Analytical Lab.

The Packaging Laboratory consists of three separate laboratory areas: (1) the Materials Quality Control Laboratory ("MQC Lab"), (2) the Air Laboratory ("Air Lab"), and (3) the Bottle House Laboratory ("BHL Lab"). The MQC Lab and BHL Lab are located on the second floor of the Packaging Building which also houses extensive production, bottling, packaging, storage, and shipping facilities. The Air Lab is located in the basement of the Pitch and Rack House where the beer is aged in vast vats.

The MQC Lab is equipped with equipment, much of which is similar to equipment in the Analytical Lab. A variety of tests is performed in the MQC Lab to analyze the materials used in the packaging of beer. The performance of some of these tests requires that technicians go into the production and packaging area of the plant for brief periods of time. The tests performed are simple, routine, and standardized, and may also be described as "cookbook type" tests. They are performed in accordance with specific procedures, and the technicians do not require any prior experience to perform them. As in the Analytical Lab, the only training required is a demonstration of these standardized procedures.

The working conditions in the MQC Lab are similar to the working conditions in the Analytical Lab, and there is no substantial difference in terms of the skill, effort, and responsibility required between the jobs in the Analytical Lab and the MQC Lab.

Four or five technicians have been assigned to the MQC Lab on a full-time basis for periods from one to four and a half years.

During the period January 1961 to January 1965, there were three shifts

in the Analytical Lab. These shifts ran from 8 to 4, 3 to 11, and 11 to 7. The second two shifts were not always run. Under the Union contract, women were permitted to work only on the first shift in the Analytical Lab. The men who worked on other shifts in the Analytical Lab received 70 cents per hour more than the women did. This 70 cents per hour was in addition to the contract shift differential of 10 to 16 cents an hour. After January 2, 1965, only the first shift in the Analytical Lab was operated. For several years prior to the effective date of the Equal Pay Act, men and women concurrently and interchangeably performed, on a full-time basis, the tests in the Analytical Lab. On occasion, women trained the men to perform the tests in the Analytical Lab. The women, however, were paid 70 cents an hour less than the men working on the same shift. After the effective date of the Equal Pay Act, men and women continued to perform, on a full-time basis, the tests in the Analytical Lab, doing substantially the same work.

During the period July 10, 1964 to January 2, 1965, the men were transferred out of the Analytical Lab to the Packaging Lab.[3] During the period of January 2, 1965 to October 31, 1966, Miller permitted only women to perform tests in the Analytical Lab. The women continued to receive 70 cents an hour less than the men who were transferred from this lab to the Packaging Lab.

On October 31, 1966, Miller resumed its practice of employing men as well as women in the Analytical Lab. At this time, both men and women were paid the same lower hourly rate in that this rate continued to be 70 cents an hour less than that received by the technicians working in the Packaging Lab. Prior to October 1966, women were permitted to work only in the Analytical Lab.

---

3. One male who was removed from the Analytical Lab during this time was subsequently returned to the Analytical Lab on a later shift. However, he was later again transferred out of the Analytical Lab.

## RATES OF PAY

Since January 1957, the Union has been the exclusive collective bargaining agent for all of Miller's technicians. The technicians have been paid at the base hourly rates established by the union contracts. The base rates are increased pursuant to these contracts by a shift differential ranging from 10 to 16 cents an hour for work on shifts other than the first shift.

The technician classifications and base wage rates set forth in the contracts from 1959 to 1965 clearly establish that women received at least 70 cents an hour less than their male counterparts.

Under the 1959–1961 contract, irrespective of which laboratory they worked in, all men were classified as "Laboratory Technicians Packaging Quality Controls"; all women were classified as "Laboratory Technicians Product Quality Control" or as "Laboratory Technicians Statistical Quality Control." The 1959–1961 contract classified technician employees and established base hourly rates as follows:

|  | Laboratory Technicians Packaging Quality Control | Laboratory Technicians Product Quality Control | Laboratory Technicians Statistical Quality Control |
|---|---|---|---|
| Effective 6/1/60 | $2.90 | $2.20 | $2.00 |

The 1961 to 1965 contracts covering the technicians distinguished between male and female employees and continued the 70 cents per hour pay differential according to the following scale:

|  | Present Male Employees | Present Female Employees |
|---|---|---|
| Effective 6/1/61 | $3.02 | $2.32 |
| Effective 6/1/62 | 3.13 | 2.43 |
| Effective 6/1/63 | 3.23 | 2.53 |
| Effective 12/1/63 | 3.24 | 2.54 |
| Effective 6/1/64 | 3.34 | 2.64 |

The 1965 to 1969 contracts changed the terminology of classification of technicians but maintained the 70 cents per hour wage differential according to the following scale:

|  | Packaging Laboratory Work | Analytical Laboratory Work |
|---|---|---|
| Retroactive to 6/1/65 | $3.46 | $2.76 |
| Effective 6/1/66 | 3.60 | 2.90 |
| Effective 6/1/67 | 3.77 | 3.07 |
| Effective 6/1/68 | 3.95 | 3.25 |

In the negotiations leading up to the adoption of each of the contracts, the Union repeatedly proposed equal base hourly rates for all technicians. These Union proposals were rejected by Miller.

Except for the men employed in the Analytical Lab since October 31, 1966, the women in the Analytical Lab have always received 70 cents per hour less than any man. These men employed in the Analytical Lab since October 31, 1966, have received the same pay as the women employed in the Analytical Lab.

## WAS THE WORK PERFORMED BY MEN AND WOMEN LAB TECHNICIANS ON DIFFERENT SHIFTS IN THE ANALYTICAL LAB IN 1964 "EQUAL WORK" WITHIN THE MEANING OF 29 U.S.C. § 206(d)?

Miller contends that the men technicians in the Analytical Lab on the later shifts were entitled to higher pay because their work was not "equal" within the meaning of the Act. As far as the tests themselves are concerned, I have already found and concluded that there was no substantial difference in the skill, effort, and responsibility required to perform them. Consequently, the only basis upon which the work involved could be held to be unequal would be to find that the work was not performed under similar conditions because the men worked in the evening.

It is not subject to serious dispute that there is some difference in working conditions between the first, second, and third shifts merely because the work is performed at different times of the day. This has been recognized by the parties to the collective bargaining agreements in innumerable labor contracts which embody a standard shift differential payment over and above the basic hourly wage for work performed on the second or third shift. Such a shift differential is not per se discrimination in pay on the basis of sex. Wirtz v. Basic Incorporated, 256 F.Supp. 786 (D.C.Nev.1966).

However, an entirely different question is presented when the men working the later shift receive the standard shift differential, and in addition receive a base rate in excess of that paid to women doing the same work at a different time of the day. Such was the situation presented in Wirtz v. Basic Incorporated, supra, where the court concluded that although working conditions were different for men working at night, the shift differential payment compensated for such difference, and that the balance of the difference in wage rates between the men and women performing equal work was attributable only to discrimination based on sex.

Such a conclusion is even more strongly suggested in the case at bar. Prior to June 11, 1964, the effective date of the Equal Pay Act, Miller employed men and women as lab technicians in the Analytical Lab on the same shift— the first shift—but paid the men 70 cents per hour more than it paid the women. After June 11, 1964, and until January 1965, men who worked shifts other than the first shift in the Analytical Lab (the women being restricted to the first shift) were paid, in addition to the standard shift differential, 70 cents an hour more than the women.

I therefore find that Miller discriminated on the basis of sex in paying women in the Analytical Lab 70 cents per hour less than it paid men in the same lab.

## DID THE TRANSFER OF MEN TECHNICIANS FROM THE ANALYTICAL LAB, WITHOUT RAISING THE WAGE RATE OF WOMEN TECHNICIANS IN THE ANALYTICAL LAB, SATISFY THE REQUIREMENTS OF 29 U.S.C. § 206(d)?

The Secretary contends that the transfer of men from the Analytical Lab shortly after the effective date of the Equal Pay Act was an action designed solely to circumvent the provisions of the Act, and that by refusing to raise the wage rate of the women in the Analytical Lab, either before or after the transfer of the men, Miller has violated,

and continues to violate, the requirements of the Act.

The correctness of this contention depends on whether the men involved continued to be paid the higher rate "for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions * *." § 206(d) (1).

■ It is, therefore, necessary to determine the meaning of the term "equal" as used in this statute. The most adequate definition of this term, I have found, in light of the extensive legislative history of the Equal Pay Act, is the definition in Wirtz v. Basic Incorporated, 356 F.Supp. 786, 790 (D.C.Nev.1966):

" * * * Equal does not mean identical, and insubstantial differences in the skill, effort and responsibility requirements of particular jobs should be ignored. * * * The job requirements should be viewed as a whole."

■ The jobs in the Analytical Lab and the Packaging Lab are not identical. However, after touring the plant and seeing the jobs actually being performed, reading the lengthy stipulations in this case, hearing the extensive evidence presented at trial, and studying the briefs, I believe the jobs involved are equal within the meaning of the Equal Pay Act. There is no substantial difference in the skill, effort, or responsibility required to perform the jobs in these laboratories. Both men and women currently perform all the jobs in these laboratories concurrently and interchangeably with others assigned to the same lab.

I further find that the working conditions in the laboratories involved are similar, although not identical. The temperatures are reasonably constant though subject to periodic fluctuation in any of the labs. The noise levels in all the labs vary somewhat from time to time depending upon the tests being performed. Special clothing of one sort or another is required in all the labs.

It therefore appears that the transfer of the men from the Analytical Lab did not avoid Miller's liability under the provisions of § 206(d). There was still a wage discrepancy between men and women doing equal work on jobs, the performance of which required equal skill, effort and responsibility and which were performed under similar working conditions. Prior to October 31, 1966, the women were still confined to the first shift in the Analytical Lab and received a base wage rate of 70 cents per hour less than the men in the Packaging Lab.

IS THE CONTINUED PRACTICE OF PAYING ALL LAB TECHNICIANS IN THE ANALYTICAL LAB AT A BASE RATE OF 70 CENTS PER HOUR LESS THAN ALL LAB TECHNICIANS IN THE PACKAGING LAB A VIOLATION OF 29 U.S.C. § 206(d)?

Since October 31, 1966, Miller has employed both men and women in the Analytical Lab at the same wage rate. Likewise, Miller has allowed women as well as men to work in the Packaging Lab at the same wage rate. However, the base rate paid in the Packaging Lab is still 70 cents per hour higher than that paid in the Analytical Lab.

I have found that the jobs involved in the Analytical Lab and the Packaging Lab are equal work within the meaning of the Equal Pay Act. Thus, the failure to pay the women in the Analytical Lab at the same base rate as that paid to the men in the Packaging Lab is, on its face, a violation of the provisions of 29 U.S.C. § 206(d).

The Equal Pay Act specifically provides that:

" * * * an employer who is paying a wage rate differential in violation of this subsection shall not, in order to comply with the provisions of this subsection, reduce the wage rate of any employee." 29 U.S.C. § 206(d) (1).

It is the contention of the Secretary that the current practice of paying men

in the Analytical Lab the base rate of 70 cents per hour lower than that paid in the Packaging Lab amounts to a reduction of wages within the meaning of the ·statute. Consequently, the Secretary argues that Miller is still in violation of the Equal Pay Act.

Miller takes the position that since none of the men currently .employed in the Analytical Lab were employed at the time Miller resumed the practice of employing men in the Analytical Lab, the company has not reduced the wage rate of any employee by paying them at the lower rate.

■ Since I have already found that the jobs in the Analytical Lab and the Packaging Lab are equal work within the meaning of the Act, and since Miller must therefore increase the base wage rate of the women employed in the Analytical Lab to an amount equal to that received by the men in the Packaging Lab, the contention advanced by Miller with regard to the men now employed in the Analytical Lab would lead to the anomalous result of the court causing discriminatory wages based on sex. If the court were to adopt the construction of the statute advanced by Miller, the court would be compelled to order Miller to increase the wage rate of the women in the Analytical Lab but not that of the men in the same lab. On the basis of the facts found in this case, it would appear that these men would then have grounds to complain that they were subject to discrimination in wage rate on the basis of sex for the performance of equal work. Such a result was certainly not the intent of Congress, nor would it be a reasonable construction of the statute. I am not willing to adopt such a position or cause such a result.

I find and conclude that by transferring men from the Analytical Lab while paying them the higher wage rate, then hiring other men in the Analytical Lab at a later date and at a lower rate, Miller in effect reduced the rate of pay of men in the Analytical Lab, although the individual men involved may not have been previously employed in the Analytical Lab. This action, I believe, is prohibited by the express terms of the Equal Pay Act which states that:

"* * * an employer who is paying a wage rate differential in violation of this subsection shall not, in order to comply with the provisions of this subsection, reduce the wage rate of any employee." 29 U.S.C. § 206 (d) (1).

## HAVING VIOLATED THE PROVISIONS OF THE EQUAL PAY ACT, IS MILLER ABSOLVED OF LIABILITY UNDER THE PROVISIONS OF 29 U.S.C. § 259?

Section 259, 29 U.S.C., relieves an employer of liability for violation of the Act if the employer has in good faith relied on administrative interpretation.[4]

4. 29 U.S.C. § 259. "Reliance in future on administrative rulings, etc.

"(a) In any action or proceeding based on any act or omission on or after May 14, 1947, no employer shall be subject to any liability or punishment for or on account of the failure of the employer to pay minimum wages or overtime compensation under the Fair Labor Standards Act of 1938, as amended, the Walsh-Healey Act, or the Bacon-Davis Act, if he pleads and proves that the act or omission complained of was in good faith in conformity with and in reliance on any written administrative regulation, order, ruling, approval, or interpretation, of the agency of the United States specified in subsection (b) of this section, or any administrative practice or enforcement policy of such agency with respect to the class of employers to which he belonged. Such a defense, if established, shall be a bar to the action or proceeding, notwithstanding that after such act or omission, such administrative regulation, order, ruling, approval, interpretation, practice, or enforcement policy is modified or rescinded or is determined by judicial authority to be invalid or of no legal effect.

"(b) The agency referred to in subsection (a) of this section shall be—

"(1) in the case of the Fair Labor Standards Act of 1938, as amended— the Administrator of the Wage and Hour Division of the Department of Labor; * * *."

Miller asserts that it should not be held liable for violation of the Act because an investigator of the Department of Labor, Mr. John Wagner ("Wagner"), visited Miller's plant in 1965, after the removal of men from the Analytical Lab, and in June 1965, gave Miller a document referred to as "Summary of Unpaid Wages." This document was represented by Wagner, the investigator, to be an indication of Miller's total liability under the Fair Labor Standards Act.

■■ I find that this summary was not an "administrative regulation, order, ruling, approval or interpretation" of the Administrator of the Wage and Hour Division of the Department of Labor as required by the statute. The language of the statute connotes, and the legislative history of the Act shows, that Congress intended to exonerate only those who relied upon formal rulings. Spring v. Washington Glass Co., 153 F.Supp. 312 (W.D.Pa.1957); Giannini v. Standard Oil Co., 130 F.Supp. 740 (N.D.Ind.1955); Burke v. Mesta Machine Co., 79 F.Supp. 588 (W.D.Pa.1948). The "Summary of Unpaid Wages" is not such a formal ruling or opinion. It contains no analysis of the facts or the law. It merely lists the names and period of employment covered (from the effective date of the equal pay provisions to January 9, 1965) and the amount of back pay due. A document that does nothing more than make an account of back wages due was not intended by Congress to be the equivalent of a formal legal ruling of the Administrator of the Wage and Hour Division of the Department of Labor.

The oral representations that this was the total liability, and/or that there were no further violations of the Equal Pay

Act, does not amount to a " * * * *written* administrative regulation, order, ruling, approval, or interpretation * *" (emphasis added), 29 U.S.C. § 259, of the Administrator of the Wage and Hour Division of the Department of Labor. Consequently, Miller is not entitled to assert such as a bar to basic liability.

## DID MILLER ACT IN GOOD FAITH?

Section 260, 29 U.S.C., absolves an employer from liability for liquidated damages if he has acted in good faith.[5]

Miller contends that even if it is not entitled to the absolute exoneration provided in § 259, it should nonetheless not be held liable for liquidated damages as it acted in good faith in its effort to comply with the provisions of the Equal Pay Act. In support of its assertion of good faith actions, Miller asserts that it had reasonable grounds to believe it was not in violation of the Fair Labor Standards Act because of the visit to Miller's plant by an investigator of the Department of Labor and his oral representation that a statement of unpaid wages prepared by him showed Miller's total liability under the Act.

■ There are several difficulties with this argument. An investigator from the Department of Labor is not the Administrator of the Wage and Hour Division and is not a person upon whom Miller is, by statute, clearly entitled to rely. This investigator did not visit the plant until after a state court action had been commenced by the women challenging Miller's practice of wage discrimination. Miller could have obtained a ruling or an opinion upon which it could have relied with impunity even if the Department of

5. 29 U.S.C. § 260. "Liquidated damages "In any action commenced prior to or on or after May 14, 1947 to recover unpaid minimum wages, unpaid overtime compensation, or liquidated damages, under the Fair Labor Standards Act of 1938, as amended, if the employer shows to the satisfaction of the court that the act or omission giving rise to such action was in good faith and that he had reasonable grounds for believing that his act or omission was not a violation of the Fair Labor Standards Act of 1938, as amended, the court may, in its sound discretion, award no liquidated damages or award any amount thereof not to exceed the amount specified in section 216(b) of this title."

Labor subsequently changed its position. (See 29 C.F.R. §§ 790.13–790.19.) Miller, however, chose not to do so. Instead, I believe Miller made a conscious effort to circumvent the requirements of the Equal Pay Act by the device of transferring men from the Analytical Lab. No substantive changes were made in the jobs in the Analytical and Packaging Labs. Miller simply did not want to raise the wages of the women and devised a scheme by which it hoped to avoid doing so. I do not believe that Miller has demonstrated that it made any good faith efforts to comply with the Equal Pay Act or that it had reasonable grounds to believe that it was not in violation of the Act.

Consequently, the individual plaintiffs in this action are entitled to liquidated damages and attorney's fees pursuant to 29 U.S.C. § 216(b).

## ARE EITHER THE LOCAL OR INTERNATIONAL UNION LIABLE FOR THE VIOLATIONS OF 29 U.S.C. § 206(d)?

The Equal Pay Act provides that "No labor organization * * * shall cause or attempt to cause * * * an employer to discriminate against an employee * * *" in violation of the Act. 29 U.S.C. § 206(d) (2). On its face, the statute requires some sort of affirmative action by the union involved. Miller contends that by signing the collective bargaining agreements, pursuant to which the wage discrimination occurred, both the Local Union and the International "caused" Miller to discriminate.

The facts do not support such a conclusion. There is no evidence that the unions proposed the discriminatory provisions. On the contrary, it was shown that the unions requested that the technicians' wages be equalized and that Miller rejected this proposal. The fact that the unions did not choose to go on strike over the issue of Miller's refusal to equalize the wages does not, in my view, support Miller's claim that

the unions caused or attempted to cause Miller to discriminate.

For all the foregoing reasons, I therefore conclude:

1. That the Secretary is entitled to the injunctive relief requiring Miller to increase by 70 cents per hour the base hourly rates of the men and women technicians in the Analytical Lab.

2. That the individual plaintiffs, Virginia Murphy, Veronika Monostori, and Catherine Pelt, are entitled to a judgment against Miller in an amount consistent with this opinion.

3. That the third party defendants, the Local and the International Union, are entitled to have the third party complaint of Miller against them dismissed.

Counsel for plaintiffs in both actions and for the third party defendants are directed to draft an order for judgment in accordance with this opinion. The proposed order shall be submitted to opposing counsel for approval as to form only before being submitted to the court.