457 F.2d 221
 9 Fair Empl.Prac.Cas. 726,
20 Wage & Hour Cas. (BN 500,
4 Empl. Prac. Dec. P 7691, 67 Lab.Cas. P 32,641
 James D. HODGSON, Secretary of Labor, United States
Department of Labor, Plaintiff-Appellee,
v.
MILLER BREWING COMPANY, Defendant-Appellant.
Virginia MURPHY et al., Plaintiffs-Appellees,
Plaintiffs-Cross-Appellants,
v.
MILLER BREWING COMPANY, Defendant-Appellant, Defendant-Cross-Appellee.
 Nos. 18560, 18929.
 United States Court of Appeals,
Seventh Circuit.
 March 2, 1972.
 
 George F. Graf, Milwaukee, Wis., Frank J. Tuk, Cincinnati, Ohio, T. L. Tolan, Jr., Samuel J. Recht, Milwaukee, Wis., for defendant-appellant.
 Irvin B. Charne, Milwaukee, Wis., for appellees, Murphy et al.
 Carin Ann Clauss, U. S. Dept. of Labor, Washington, D. C. (Peter G. Nash, Sol. of Labor, Bessie Margolin, Associate Sol., Caruthers G. Berger, Herman Grant, Regional Sol., and Sylvia S. Ellison, Washington, D. C., on the brief) for appellee, James D. Hodgson, Secretary of Labor.
 Before SWYGERT, Chief Judge, HASTINGS, Senior Circuit Judge, and KILEY, Circuit Judge.
 HASTINGS, Senior Circuit Judge.
 
 
 1
 These consolidated cases and appeals arise under the Fair Labor Standards Act of 1938[1] (Act) and the Equal Pay Act of 1963.[2] No. 18929 was filed October 15, 1965 by the three female plaintiffs,[3] all laboratory technicians employed by defendant Miller Brewing Company (Miller), to recover back wages, liquidated damages and attorneys' fees under 29 U.S.C.A. Sec. 216(b). No. 18560 was commenced March 31, 1967 by the Secretary of Labor pursuant to 29 U.S.C.A. Sec. 217 to enjoin Miller from violating the equal pay provisions of the Act by paying discriminatory wages to its female laboratory technicians and by reducing the wage rates of certain male technicians. The cases were tried together in June 1968, during the course of which the trial judge toured Miller's operations in Milwaukee, Wisconsin and observed the laboratory technicians' jobs actually being performed. The district court filed its opinion, reported as Murphy v. Miller Brewing Company, D.C., 307 F.Supp. 829 (1969), in favor of the three private plaintiffs and the Secretary of Labor. Judgment was entered enjoining Miller from violating the Act and ordering Miller to equalize the wage rates of all employees in the Analytical Laboratory with those in the Materials Quality Control Laboratory by increasing the former 70 cents per hour. Judgment was also entered in favor of the three private plaintiffs granting back pay, liquidated damages and attorneys' fees.[4] Miller has appealed. The private plaintiffs have cross-appealed on the question of interest. We affirm.
 
 
 2
 Miller is engaged in the production and sale of beer which is sold in interstate commerce within the meaning of Sec. 206(d). The equal pay provisions of the Act have been applicable to Miller's employees since June 11, 1964.
 
 
 3
 These cases primarily involve employees in two main laboratory facilities-the Analytical Laboratory and the Packaging Laboratory.
 
 
 4
 The Analytical Lab is located on the second floor of the "Research Building." The technicians, both men and women, perform tests to analyze and measure the chemical and physical characteristics of raw materials, beer in process, packaged beer and competitors' products. The tests are conducted according to standardized processes and procedures. No prior experience is necessary and a visual demonstration of the procedures is sufficient training. There are no differences of any significance in terms of the skill, effort, and responsibility required to perform the various tests and other duties in the Analytical Lab.
 
 
 5
 During the period from January 1961 to January 1965, female laboratory technicians were restricted to work in the Analytical Lab. They were also restricted to working only on the first shift from 8:00 a. m. to 4:00 p. m. in that laboratory. The other two shifts, which were not always operated, were run by male technicians. The men who worked on the other shifts in the Analytical Lab received 70 cents per hour more than the women. This was in addition to a shift differential of 10 to 16 cents per hour.
 
 
 6
 After the effective date of the Equal Pay Act, men and women continued concurrently and interchangeably to perform the same tests and jobs in the Analytical Lab. On occasion women trained the men to perform these tests. Despite this, women continued to receive 70 cents per hour less than the men for the same work.
 
 
 7
 During the period July 10, 1964 to January 2, 1965, men were transferred out of the Analytical Lab to the Packaging Lab. During the period of January 2, 1965 to October 31, 1966, Miller allowed only women to perform the work in the Analytical Lab. The women continued to receive 70 cents per hour less than the men who had been transferred out.
 
 
 8
 After October 31, 1966, both men and women were allowed to work in the Analytical Lab. At this time both men and women in the Analytical Lab received the same lower rate which was 70 cents an hour less than what the men in the Analytical Lab had previously received and than what technicians working in the Packaging Lab received. After October 1966, women were permitted to transfer to the Packaging Lab as vacancies arose.[5]
 
 
 9
 The Packaging Lab, which prior to October 1966 was restricted to male technicians, consists of three separate laboratory areas: (1) the Materials Quality Control Laboratory (MQC Lab); (2) the Air Laboratory; and (3) the Bottle House Laboratory.
 
 
 10
 The MQC Lab is located on the second floor of the "Packaging Building." While it is near the production area, it is enclosed and separated from it by tile and glass walls and doors. The temperature and noise levels in both the Analytical and MQC Labs are substantially the same.[6] Both labs are equipped with sundry chemical testing equipment much of which is the same. As in the Analytical Lab, the tests in the MQC Lab are standardized and training consists merely of demonstrations. Most of the tests are performed in the MQC Lab but a few require the employee to go outside the laboratory. Time spent outside the laboratory varies from zero to one and a half hours per day.
 
 
 11
 We agree with the district court's conclusion that "the working conditions in the MQC Lab are similar to the working conditions in the Analytical Lab, and there is no substantial difference in terms of the skill, effort and responsibility required between the jobs in the Analytical Lab and the MQC Lab."[7] Thus, we find that the jobs in the two laboratories constitute "equal work"[8] within the meaning of Sec. 206(d).[9]
 
 
 12
 The first issue for our resolution is whether the female laboratory technicians in the Analytical Lab, including the three women plaintiffs, were discriminated against by Miller solely on the basis of sex, in violation of Sec. 206(d) of the Equal Pay Act.[10]
 
 
 13
 Keeping in mind the broad remedial purpose of the Equal Pay Act, the following language from Shultz v. Wheaton Glass Company, 3 Cir., 421 F.2d 259, at 265 (1970), cert. denied, 398 U.S. 905, 90 S.Ct. 1696, 26 L.Ed.2d 64, sets the tone for reviewing the discriminatory wage policy in this case: "The Act was intended as a broad charter of women's rights in the economic field. It sought to overcome the age-old belief in women's inferiority and to eliminate the depressing effects on living standards of reduced wages for female workers and the economic and social consequences which flow from it."
 
 
 14
 We find that there are two significant situations in which Miller has discriminated and continues to discriminate against women.
 
 
 15
 It is almost without question that Miller's wage differential between men and women, who, we have found, performed equal work in the Analytical Lab, from the effective date of the Equal Pay Act (June 11, 1964) to the date when all men had been transferred out of the Analytical Lab (January 2, 1965) was in violation of Sec. 206(d). At that juncture Miller was required, in order to avoid continued violation of the Act, to raise the wages of the women laboratory technicians in the Analytical Lab by 70 cents per hour.
 
 
 16
 In order to circumvent this requirement, Miller instituted the following arrangement: (1) all men were transferred out of the Analytical Lab to the Packaging Lab and women were restricted to working in the Analytical Lab; (2) women continued to receive 70 cents per hour less than the men had formerly earned in the Analytical Lab and now earn in the Packaging Lab; (3) then, about one year later, the Analytical Lab was again opened up to both male and female technicians with all receiving the lower women's rate; and (4) at the same time, women were for the first time allowed to work at the transfer to the higher paying Packaging Lab jobs.
 
 
 17
 As a result of this scheme, Miller arrived at the same result as if it had initially, after the effective date of the Equal Pay Act, equalized pay in the Analytical Lab by lowering the male employees wages by 70 cents per hour. Since that in substance is what was accomplished, Miller violated Sec. 206(d). The proviso of Sec. 206(d) which Miller violated is "[t]hat an employer who is paying a wage rate differential in violation of this subsection shall not, in order to comply with the provisions of this subsection, reduce the wage rate of any employee.[11]
 
 
 18
 "At the outset, we think it clear that the Company did not cure the alleged violation of the Equal Pay Act by agreeing to open the night shift to women. If in fact the work of the women was equal to that of the men, the Company became obligated to pay them the same scale as their male counterparts on the effective date of the Act * * *. It could not relieve itself of that obligation by agreeing to allow some women to work on the night shift at a higher rate of pay at some future date when a vacancy occurred. [Citation omitted.] Nor could it achieve compliance by opening the AM-PM shifts to men at the lower rate." Shultz v. American Can Company-Dixie Products, 8 Cir., 424 F.2d 356, at 359 (1970).
 
 
 19
 The second situation in which Miller has discriminated against the female Analytical Lab technicians is in paying them 70 cents per hour less than the male employees in the MQC Lab. We have already found that the jobs in these two laboratories constitute "equal work" within the meaning of those terms in Sec. 206(d). It is irrelevant that the male technicians in the Analytical Lab are now also receiving the lower wage or that the jobs in the MQC Lab are now open to women at the higher rate, since we have found those circumstances to be part of a plan to circumvent the Act's requirement that the wages of the women in the Analytical Lab be raised. See American Can, supra.
 
 
 20
 Miller argues that if we find the jobs in Analytical and MQC to be equal we are engaged in job rating rather than determining whether the jobs are the same. We agree that the Equal Pay Act does not authorize courts to equalize wages merely because they find that two substantially different jobs are worth the same monetarily to the employer and therefore should be paid the same wages. However, "[t]here is evidence that Congress intended that jobs of the same or closely related character should be compared in applying the equal pay for equal work standard (Daily Congressional Record, House, May 23, 1963, pp. 8686, 8698). Jobs that require equal skill, effort, and responsibility in their performance within the meaning of the Act are usually not identical in every respect (Daily Congressional Record, Senate, May 28, 1963, p. 9219)." 29 C.F.R. Sec. 800.120. "Application of the equal pay standard is not dependent on job classifications or titles but depends rather on actual job requirements and performance." 29 C.F.R. Sec. 800.121. See also Shultz v. Wheaton Glass Company, 3 Cir., 421 F.2d 259, 265 (1970), cert. denied, 398 U.S. 905, 90 S.Ct. 1696, 26 L.Ed.2d 64.
 
 
 21
 In light of the foregoing, we conclude and hold that Miller has violated the Equal Pay Act and that its discriminatory practices did not cease with the removal of all male laboratory technicians from the Analytical Lab, or with the opening of all jobs in the Analytical Lab and MQC Lab to both men and women.
 
 
 22
 The next issue is whether it was proper for the district court to award liquidated damages to the three private plaintiffs. Section 216(b), 29 U.S.C.A. provides, inter alia, for the recovery of back pay for violations of the Equal Pay Act and "an additional equal amount as liquidated damages." On May 14, 1947, 29 U.S.C.A. Sec. 260 of the Portal-to-Portal Pay Act became effective. It provides that a court may in its sound discretion award no liquidated damages if the employer can show that it acted in good faith.[12]
 
 
 23
 Miller claims that it acted in good faith for several reasons. First, Miller asserts that an investigator from the Department of Labor visited its plant in 1965 and on June 11, 1965, delivered a "Summary of Unpaid Wages" to Miller and orally represented at that time that the summary showed Miller's total liability under the Act. Second, it claims to have relied upon the determinations of the Wisconsin courts concerning Miller's discrimination under a state statute which is substantially similar to the federal Act.
 
 
 24
 It should first be noted that a lower court's decision concerning the employer's good faith or lack thereof is a question of fact that will be modified on appeal only if shown to be clearly erroneous. Day & Zimmermann v. Reid, 8 Cir., 168 F.2d 356, 360 (1948); Lassiter v. Guy F. Atkinson Co., 9 Cir., 176 F.2d 984, 993 (1949); Tripp v. May, 7 Cir., 189 F.2d 198 (1951); and Van Dyke v. Bluefield Gas Co., 4 Cir., 210 F.2d 620, 622 (1954), cert. denied, 347 U.S. 1014, 74 S.Ct. 870, 98 L.Ed. 1137. In this regard the district court stated: "I do not believe that Miller has demonstrated that it made any good faith efforts to comply with the Equal Pay Act or that it had reasonable grounds to believe that it was not in violation of the Act." 307 F.Supp. at 839. We agree.
 
 
 25
 The investigator was not a person upon whom Miller, by statute, was entitled to rely, and in any event, he did not issue his opinion until after the three women plaintiffs had commenced their state court action challenging Miller's discriminatory wage policy. Also, Miller's reliance on the actions of the Wisconsin courts is misplaced since the Wisconsin Supreme Court did not issue its decision until January 30, 1968 and the accrual of all damages to the private plaintiffs ceased in June 1967. In addition, we are not certain that Miller can properly rely on the Wisconsin decision, since in fact the courts there found discrimination but held that under the applicable Wisconsin statute damages were not recoverable. Murphy v. Industrial Comm., 37 Wis.2d 704, 155 N.W.2d 545 (1968).
 
 
 26
 The third issue which Miller raises is whether the award of $20,000 attorneys' fees to the three women plaintiffs was excessive and an abuse of discretion. Section 216(b) allows an employee claiming under the Fair Labor Standards Act to recover reasonable attorneys' fees. The amount of attorneys' fees is within the sound discretion of the trial court and much reliance should be placed on the findings of the trial judge because of his intimate relation-ship with the case. Bable v. T. W. Phillips Gas and Oil Company, 3 Cir., 287 F.2d 21 (1961); Michigan Window Cleaning Co. v. Martino, 6 Cir., 173 F.2d 466, 468 (1949); and Van Dyke, supra at 622.
 
 
 27
 Miller points to the fact that the total damage award to the plaintiffs was only $24,371.20; yet, the attorneys' fees were almost equal to that.
 
 
 28
 The question now presented to this court is not what amount of attorneys' fees this court would have awarded but, rather, was the trial court's award an abuse of its discretion. The amount of damages recovered is only one factor to be considered in arriving at a reasonable fee award. To hold otherwise would in reality prevent individuals with relatively small claims from effectively enforcing their rights and protecting the interest of the public in having equal pay for equal work. Employees exercising their rights under the Equal Pay Act are benefiting not only themselves but also the general public as well.[13] This is pertinent in light of Miller's conscious effort to circumvent the Equal Pay Act. We have reviewed the "Itemized Statement of Services by Counsel for Plaintiffs" submitted to the trial judge by counsel and give great weight to the opportunity of the district court to view the efforts of counsel firsthand. We find and hold that the award given did not constitute an abuse of discretion.
 
 
 29
 The final issue, which is raised by the private plaintiffs in their cross-appeal, is whether the district court erred in concluding that where the maximum amount of liquidated damages are awarded it cannot in addition award interest on the back pay.
 
 
 30
 The Fair Labor Standards Act, 29 U.S.C.A. Sec. 201 et seq., is silent as to the allowance of interest. Prior to the enactment of the Portal-to-Portal Pay Act of 1947, inter alia, 29 U.S.C.A. Sec. 260, which made the award of liquidated damages discretionary, the courts were required to award liquidated damages in an amount equal to the actual damage award. Accordingly, prior to the enactment of Sec. 260, the Supreme Court in Brooklyn Bank v. O'Neil, 324 U.S. 697, at 715, 65 S.Ct. 895, at 906, 89 L.Ed. 1296 (1945), held, in regard to 29 U.S.C.A. Sec. 216(b), that "[t]o allow an employee to recover the basic statutory wage and liquidated damages, with interest, would have the effect of giving an employee double compensation for damages arising from delay in the payment of the basic minimum wages."
 
 
 31
 Regardless of the change in the basis for awarding liquidated damages, as evidenced by Sec. 260, we think that Brooklyn is still controlling where, as here, the maximum amount of liquidated damages are awarded. All federal appellate cases brought to our attention where interest has been awarded involved situations where liquidated damages had not been awarded; hence, they are distinguishable from the case at bar. See Hodgson v. Daisy Manufacturing Company, 8 Cir., 445 F.2d 823 (1971); Hodgson v. Wheaton Glass Co., 3 Cir., 446 F.2d 527, 534 (1971); McClanahan v. Mathews, 6 Cir., 440 F.2d 320, 325 (1971); and Holtville Alfalfa Mills v. Wyatt, 9 Cir., 230 F.2d 398, 401 (1955). Thus, we find that the district court was correct in its determination not to award interest in addition to liquidated damages.
 
 
 32
 The three private plaintiffs further request that we remand this matter for a determination of the amount of additional attorneys' fees for services on this appeal. This we decline to do. The award of $20,000 as hereinabove approved shall stand without further change.
 
 
 33
 For the foregoing reasons, the judgments appealed from are in all respects affirmed.
 
 
 34
 Affirmed.
 
 
 
 [1]
 29 U.S.C.A. Sec. 201 et seq
 
 
 [2]
 29 U.S.C.A. Sec. 206(d)
 
 
 [3]
 Virginia Murphy, Veronika Monostori and Catherine Pelt
 
 
 [4]
 Miller was ordered to pay Murphy $3,399.20, Monostori $4,491.20 and Pelt $4,295.20 in back pay, together with an additional equal amount to each as liquidated damages. Attorneys' fees were awarded in the amount of $20,000
 
 
 [5]
 The three women plaintiffs, Murphy, Pelt and Monostori, transferred to the Packaging Lab in October 1966, May 1967 and July 1967 respectively thus mitigating their damages
 
 
 [6]
 Factors involved in finding similarity of working conditions for purposes of Sec. 206(d) are discussed in 29 C.F.R. Sec. 800.131-2:
 "Sec. 800.131 Jobs performed under similar working conditions.
 In order for the equal pay standard to apply, the jobs must be performed under similar working conditions. It should be noted that the statute adopts the flexible standard of similarity as a basis for testing this requirement. In determining whether the requirement is met, a practical judgment is required in the light of whether the differences in working conditions are the kind customarily taken into consideration in setting wage levels. The mere fact that jobs are in different departments of an establishment will not necessarily mean that the jobs are performed under dissimilar working conditions. This may or may not be the case."
 "Sec. 800.132 Determining similarity of working conditions.
 Generally, employees performing jobs requiring equal skill, effort, and responsibility are likely to be performing them under similar working conditions. However, in situations where some employees performing work meeting these standards have working conditions substantially different from those required for the performance of other jobs the equal pay principle would not apply. For example, if some sales persons are engaged in selling a product exclusively inside a store and others employed by the same establishment spend a large part of their time selling the same product away from the establishment, the working conditions would be dissimilar. Also, where some employees do repair work exclusively inside a shop while others employed by the shop spend most of their time doing similar repair work in customers' homes, there would not be similarity in working conditions. On the other hand, slight or inconsequential differences in working conditions that are essentially similar would not justify a differential in pay. Such differences are not usually taken into consideration by employers or in collective bargaining in setting wage rates."
 
 
 [7]
 Some of the factors involved in the determination of substantial equality of jobs are contained in 29 C.F.R. Sec. 800.123, Secs. 800.125-9. In discussing the substantiality of differences Sec. 800.123 provides:
 "Sec. 800.123 Determining equality of job content in general.
 In determining whether differences in job content are substantial in order to establish whether or not employees are performing equal work within the meaning of the Act, the amounts of time which employees spend in the performance of different duties are not the sole criteria. It is also necessary to consider the degree of difference in terms of skill, effort, and responsibility. These factors are related in such a manner that a general standard to determine equality of jobs cannot be set up solely on the basis of a percentage of time. Consequently, a finding that one job requires employees to expend greater effort for a certain percentage of their working time than employees performing another job, would not in itself establish that the two jobs do not constitute equal work. Similarly, the performance of jobs on different machines or equipment would not necessarily result in a determination that the work so performed is unequal within the meaning of the statute if the equal pay provisions otherwise apply. If the difference in skill or effort required for the operation of such equipment is inconsequential, payment of a higher wage rate to employees of one sex because of a difference in machines or equipment would constitute a prohibited wage rate differential. Likewise, the fact that jobs are performed in different departments or locations within the establishment would not necessarily be sufficient to demonstrate that unequal work is involved where the equal pay standard otherwise applies. This is particularly true in the case of retail establishments, and unless a showing can be made by the employer that the sale of one article requires such a higher degree of skill or effort than the sale of another article as to render the equal pay standard inapplicable, it would be assumed that the salesmen and saleswomen concerned are performing equal work. Although the equal pay provisions apply on an establishment basis and the jobs to be compared are those in the particular establishment, all relevant evidence that may demonstrate whether the skill, effort, and responsibility required in the jobs at the particular establishment are equal should be considered, whether this relates to the performance of like jobs in other establishments or not."
 
 
 [8]
 Miller attempts to show that the work of the women was not equal to that of the men. It points to the fact that the women were allowed only to work on the day shift, thus the differential was for working nights. This is not well taken because even when the men worked the day shift they were still paid the differential and the 70 cents more at night was in addition to the shift differential of 10 to 16 cents an hour. All other differences pointed to by Miller, such as physical effort, different tests, different duties and responsibilities, we find to be insubstantial
 
 
 [9]
 The district court found that the work in the Packaging Lab as a whole was equal to the work in the Analytical Lab within the meaning of "equal work" in Sec. 206(d). Since we agree with the district court that work in the MQC Lab is equal to work in the Analytical Lab, that is sufficient to support our conclusion, infra, that the 70 cents per hour wage difference between these two laboratories violated the Equal Pay Act of 1963 and we need not reach the question of whether the district court was correct in finding the work in the Packaging Lab to be equal to work in the Analytical Lab
 
 
 [10]
 Sec. 206(d):
 "(d) (1) No employer having employees subject to any provisions of this section shall discriminate, within any establishment in which such employees are employed, between employees on the basis of sex by paying wages to employees in such establishment at a rate less than the rate at which he pays wages to employees of the opposite sex in such establishment for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions, except where such payment is made pursuant to (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex: Provided, That an employer who is paying a wage rate differential in violation of this subsection shall not, in order to comply with the provisions of this subsection, reduce the wage rate of any employee.
 (2) No labor organization, or its agents, representing employees of an employer having employees subject to any provisions of this section shall cause or attempt to cause such an employer to discriminate against an employee in violation of paragraph (1) of this subsection.
 (3) For purposes of administration and enforcement, any amounts owing to any employee which have been withheld in violation of this subsection shall be deemed to be unpaid minimum wages or unpaid overtime compensation under this chapter. (Emphasis added.)"
 
 
 [11]
 The regulations issued by the Department of Labor under the Equal Pay Act, which we are admonished to give great weight to as "a body of experience and informed judgment" by the administrative office charged with administering the Act, cover just this sort of a device. Section 800.114(c), 29 C.F.R. provides:
 "(c) That the Equal Pay Act was intended to encompass situations of this kind is confirmed by the declared purposes and terms of the Act as well as by the legislative history. The statute is intended to eliminate sex as a basis for wage differentials between employees performing equal work on jobs within the establishment, and if the rates paid for the same jobs are lower when occupants of the jobs are of one sex than they are when the jobs are filled by employees of the opposite sex, such discrimination within the establishment is equally in violation of the statutory prohibition whether or not employees of both sexes are employed in such jobs at the same time. Accordingly, where an employee of one sex is hired or assigned to a particular job to replace an employee of the opposite sex, comparison of the newly assigned employee's wage rate with that of the replaced former employee is required for purposes of section 6(d) (1), whether or not the job is performed concurrently by employees of both sexes. For example, if a particular job which in the past has been performed by a male employee becomes vacant and is then filled by a female employee, it would be contrary to the equal pay requirement to pay the female employee a lower wage rate than was paid for the same job when performed by the male employee, even though employees of both sexes may not be performing the job at the same time. Payment of the lower wage rate in such circumstances is a prohibited wage differential. The same principle is involved if all employees of one sex are removed from a particular job (by transfer or discharge) so as to retain employees of only one sex in a job previously performed interchangeably or concurrently by employees of both sexes. If a prohibited sex-based wage differential had been established or maintained in violation of the Act when the same job was being performed by employees of both sexes, the employer's obligation to pay the higher rate for the job cannot be avoided or evaded by the device of confining the job to members of the lower paid sex. Compliance with the Act in such circumstances can be achieved only by increasing the wage rate to the higher rate paid for the job when performed by employees of the opposite sex."
 
 
 [12]
 "Sec. 260. Liquidated damages
 In any action commenced prior to or on or after May 14, 1947 to recover unpaid minimum wages, unpaid overtime compensation, or liquidated damages, under the Fair Labor Standards Act of 1938, as amended, if the employer shows to the satisfaction of the court that the act or omission giving rise to such action was in good faith and that he had reasonable grounds for believing that his act or omission was not a violation of the Fair Labor Standards Act of 1938, as amended, the court may, in its sound discretion, award no liquidated damages or award any amount thereof not to exceed the amount specified in section 216(b) of this title."
 
 
 [13]
 The congressional purposes and policies embodied in the Fair Labor Standards Act are set out in 29 U.S.C.A. Sec. 202 which provides:
 "Sec. 202. Congressional finding and declaration of policy
 (a) The Congress finds that the existence, in industries engaged in commerce or in the production of goods for commerce, of labor conditions detrimental to the maintenance of the minimum standard of living necessary for health, efficiency, and general well-being of workers (1) causes commerce and the channels and instrumentalities of commerce to be used to spread and perpetuate such labor conditions among the workers of the several States; (2) burdens commerce and the free flow of goods in commerce; (3) constitutes an unfair method of competition in commerce; (4) leads to labor disputes burdening and obstructing commerce and the free flow of goods in commerce; and (5) interferes with the orderly and fair marketing of goods in commerce.
 (b) It is declared to be the policy of this chapter, through the exercise by Congress of its power to regulate commerce among the several States and with foreign nations, to correct and as rapidly as practicable to eliminate the conditions above referred to in such industries without substantially curtailing employment or earning power."